In the Interest of J.K. and J.K., Minor Children,

P.A., Mother, Appellant.

State of Iowa and J.K. and J.K., Appellees.

No. 91–1061.

Supreme Court of Iowa.

Jan. 20, 1993.

Loren H. Mitchell of Mitchell & Mohn, Estherville, for appellant.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Sp. Asst. Atty. Gen., and Judy Sheirbon, Asst. Atty. Gen., for appellee State of Iowa.

Frances E. Davis, Emmetsburg, guardian ad litem for appellee children.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

This termination of parental rights case comes to us on further review of a court of appeals decision. The court of appeals reversed the district court's judgment terminating the parental rights of a natural mother to her two children. We vacate the court of appeals decision and affirm the judgment of the district court.

Mike and Pam are the natural parents of the two children—Joshua and Jeremy— who are the subjects of these proceedings. Joshua was born December 2, 1986, and Jeremy was born May 15, 1988.

The district court terminated the parental rights of both parents[1] on the basis of Iowa Code section 232.116(1)(k) (1991). That section provides that the district court may terminate parental rights when the court finds that all of the following have occurred:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.

(2) The parent *has* a severe, chronic substance abuse problem, and presents a danger to self or others *as evidenced by prior acts.*

(3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be

---

1. Both parents appealed, but the father's appeal was dismissed because he did not file a brief. For this reason, the district court's judgment as to him stands.

returned to the custody of the parent *within a reasonable period of time* considering the child's age and need for a permanent home.

(Emphasis added.) The mother concedes that the requirement of paragraph (1) is met but denies that the conditions in paragraphs (2) and (3) exist.

■ The best interests of the children—within the parameters of Iowa Code section 232.116(1)(k)—guide our determination of whether termination of parental rights is appropriate. Those best interests include the children's long-range as well as immediate interests. We must concern ourselves with what the future likely holds for the children if the children are returned to their mother. The best evidence for this determination is the mother's past performance because that performance may indicate the quality of future care she is capable of giving. *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992).

■ Our review is de novo. *Id.* We give weight to the fact findings of the district court—especially when considering the credibility of witnesses—but we are not bound by them. Iowa R.App.P. 14(f)(7); *In re D.P.*, 431 N.W.2d 777, 780 (Iowa 1988).

### The Substance Abuse Problems

Mike was born August 12, 1960. His interest in drugs started at age fourteen when he stole morphine tablets from a pharmacy. At about the same time he began smoking marijuana and abusing alcohol. He quit school in the ninth grade.

At about age twenty-two, Mike became a self-employed contractor for small house repairs. By age twenty-five he was heavily into cocaine and admitted trying through the years virtually every popular drug except heroin. By age twenty-six he had a bad cocaine habit and, according to him, tried to "kick" it by using "crank" intravenously, to which he became addicted. By September 1988 Mike had been hospitalized for chemical dependency three times. The first time was when he was fifteen, the next time was in 1987, and the third time was in September 1988.

Pam was born June 2, 1964. A victim of sexual abuse in childhood, she began abusing alcohol and smoking marijuana at age thirteen. She dropped out of high school in tenth grade. Intelligence testing shows she is in the borderline normal range of intelligence.

When Pam was seventeen she gave birth to her first child, Chad. By age twenty, she was routinely abusing drugs and alcohol. She was using cocaine and amphetamines by means of inhalation.

In 1984 Pam, with her son Chad, began living with Mike. Pam and Mike used cocaine. When that habit got too expensive, Mike introduced Pam to crystal methamphetamines which they took intravenously. This drug usage was to go on for the next four years, even during the time Pam was pregnant with Joshua and Jeremy.

During these four years, Mike continued to work in his home repair business. The family moved frequently, living in a series of towns, dwellings, and motels. Pam often took the children to Mike's work sites and sat in the car with them while Mike worked.

The couple's relationship during these four years was marred by violence, fighting, destruction of personal belongings, and neglect of the children. During this period Chad was abused by one of his caretakers.

The couple came to the attention of the Iowa department of human services in June 1988. The department filed a child in need of assistance (CINA) petition based on a founded abuse report regarding the children. The case was continued on the condition that the couple seek services from the department. The couple did nothing and hid from the department. The following month the department received another founded abuse report regarding the children but could not find the family.

In late July the couple began having psychotic delusions manifesting themselves as the devil possessing them. One of these episodes happened while the children were present and involved them. Another happened while the couple was on the highway in their car.

Sometime in early August Mike abandoned Pam and took Joshua and Jeremy with him. Pam had to hitchhike to her parents' home. For nine days Mike tried to cope with caring for a toddler and an infant. He finally gave up on August 22 when he took Joshua and Jeremy to the department for voluntary placement in foster care, where they have remained to this day.

At this point Mike contacted Pam. The two left Chad with her mother on the pretext that they were going to seek treatment. The two, however, did not seek treatment. Instead they took to the road and continued to use drugs.

In September the couple experienced another devil possession episode. This happened while the two were spending a night in the home of Mike's parents. Shortly thereafter, the two were involuntarily committed for substance abuse at the Cherokee Mental Health Institute. Neither one made any progress at this institution because they refused to follow the rules.

The institution recommended that Mike's commitment be transferred. Mike simply left on his own. The Cherokee medical records had this notation about Mike:

This patient's aftercare plan consists of our recommendation that he go to NCARF [North Central Alcoholism Research Foundation, Inc.] and complete treatment for his drug dependenc[y] there. He does not appear to be appropriate for our treatment program. Prognosis is poor. Eventually, the prison system will have to deal with this young man.

Eventually, Mike went to the NCARF facility in Ft. Dodge. He encountered problems there, did not complete his treatment, and left against medical advice.

In the meantime, Pam was discharged from Cherokee without successfully completing her treatment either. A psychiatric evaluation report following her discharge noted that Pam believes she is incapable of functioning as an adult. The report describes her as immature and severely dependent with a history of severe drug abuse.

In late September a CINA petition in the present proceeding was filed. The other petition that had been filed earlier in a different county was dismissed. Joshua and Jeremy were adjudicated children in need of assistance in October. The following month criminal drug charges were filed against Mike and Pam because of their drug activities in July.

In January 1989 Mike and Pam pleaded guilty to the drug charges and were placed on probation. By this time Pam was pregnant with her fourth child.

The couple did not appear at the dispositional hearing in December. The department lost track of them until early January 1989. In the January 1989 dispositional order the court placed custody of Joshua and Jeremy with the department, ordered foster care to continue, ordered drug and marital counseling for the parents, and visitation at the discretion of the department.

In February Mike and Pam split up. Pam began living with her mother; Mike began living with another woman whom he eventually married and divorced.

In March, in another proceeding, the juvenile court removed Chad from Pam's care. In doing so the court noted: "The court is struck with this great reversal of the parent-child role. Pam described Chad as her friend.... Pam is still very much a child herself." Chad's natural father eventually obtained custody of the child.

Pam was still living with her mother by the time the termination hearing was held in September 1990. During this period Pam gave birth to Kimberly.

The foregoing facts demonstrate overwhelmingly that these parents have a severe chronic substance abuse problem. Given the actions of these parents during the period of their drug use, we think it is abundantly clear that these parents constitute a danger not only to themselves but to their children. At the height of their drug use they were completely unable to meet the needs of their children. They recognized this when they voluntarily placed the children with the department.

*Mother's Prognosis*

According to Pam, she has not used drugs since February 1989 when she and Mike ended their relationship. Nevertheless, for the following reasons we are convinced that her parental rights should be terminated.

It is true, as Pam points out, that she successfully completed a month-long in-patient substance abuse treatment program. But she did not complete her aftercare treatment at the half-way house because she was asked to leave. She was asked to leave because she had verbally abused the staff and her peers.

Pam conceded at the termination hearing that there were many unresolved problems for her when she left the half-way house. The half-way house was seen as a way for her to address those issues.

It is also true that Pam saw a drug counselor twice a week. She abruptly ended the visits because the counselor suggested psychiatric counseling, and she disagreed with him. He made two appointments for her, which she did not keep. The counselor's main concern apparently was that Pam still had not dealt with her past problems and still had delusions about the devil possessing her. The counselor realized these were problems beyond his area of expertise.

In addition to her refusal to submit to a psychiatric evaluation, Pam also withdrew her release for the drug counselor to talk to her caseworker. We think we are entitled to presume any information that might be forthcoming from the counselor and the psychiatric evaluation would be damaging to her.

It is also true that Pam attended Alcoholics Anonymous meetings. But those visits ended in June 1990. From that point on she attended only one, and that was the week before the termination hearing.

It is also true that Pam took positive parenting classes. The caseworker, however, saw no improvement in her parenting skills. With only one child to care for, Pam was still heavily dependent upon her mother for parenting that child.

The caseworker had been involved in this case from the filing of the CINA petition until the termination hearing. She met frequently with Mike and Pam. She knew their weaknesses. Her case permanency plan was geared toward making Pam independent and responsible, two areas in which Pam was most weak. To that end the case plan required Pam to stay away from drugs, follow through with all recommendations, secure her GED, secure permanent employment, secure a driver's license, establish her own home, and improve her parenting skills.

We only have Pam's word that she stayed away from drugs. As to the other requirements of the case plan, we agree with the caseworker that Pam made no significant progress over the two-year period. An assessment of the record coincides with the 1988 psychiatric evaluation report from the Cherokee Mental Health Institute: Pam is still incapable of functioning as an adult; she is still immature and still severely dependent upon others. These factors account in large part for her drug usage and drug dependency, as well as for her inability to parent or function as an adult. So the danger is ever present that she will resort to drugs.

The district court presented these cogent observations in its termination ruling:

Pamela appears to be much more the teen-ager. While she is the mother of these children as well as two others, this appears to have had little effect in maturing her.

....

She is unable to plan to get things done which she needs to do. She is apparently paranoid and extremely frightened of the department of human services. She is dependent, and this was noted by each provider. She seems to be continuously dependent upon her mother to help her with the care of her children. Again, Pamela's problems are ongoing and have not changed from the time of adjudication until time of trial.

We also agree with the caseworker that if the children are returned to Pam, she and Mike will probably get back together

again. And we agree with the caseworker that this would lead to the same problems that caused the two children to be taken from the couple. On this point the caseworker testified that as late as February 1990, Mike and Pam were in the caseworker's office and were talking about getting married in the future.

Experts have diagnosed Joshua and Jeremy as having behavioral disorders. There is some suggestion in the record that these disorders might be attributable to Pam's ingestion of drugs and alcohol when she was pregnant with each child. The experts think that the children's special needs require consistency, structure, and stability. They counsel against the caretaker exhibiting anger and inflicting corporal punishment. The record reveals that the foster parents recognize the children have behavioral disorders and are following the experts' advice with regard to the children's special needs.

We also agree with the caseworker that if the children were returned to Pam their behavior would probably worsen. The caseworker's opinion is based on her observation of the children in Pam's presence. The caseworker testified that from her observations,

> Pam has a difficult time parenting [Joshua, Jeremy, and Kimberly] for even a few hours at a time and with the assistance of her mother.... She has a hard time not letting one get in trouble with another one of them, and she gets very frustrated with them.

In addition the caseworker felt that Pam's borderline normal intelligence range would limit Pam's options in dealing with the children and her good judgment.

We think the district court had it just right in its termination ruling:

> There is clear and convincing evidence to support a finding of each of the above three conditions. The children were, in fact, transferred from the parents for placement in foster care.
>
> As denoted in the findings of fact, the parents have severe chronic substance abuse problems. The same have clearly in the past presented a danger to them-

selves and to the children. While the parents now present themselves as though these problems are in the past, it is simply too soon to conclude that these problems will not recur. The children have clearly been damaged by these abuses of the parents. While there have been some attempts at treatment, the same fall short of meaningful.

It is further clear that the prognosis of the parents is extremely guarded and to return the children to the custody of the parents within a reasonable time is simply irresponsible on the part of this court. The children are at an age where they need a permanent home. All of the treatment and services which have been brought to bear indicate that the children were exhibiting behavioral problems as a result of the environment in which they were raised until placed in foster care. They likewise continue to exhibit behavioral problems following visits with their parents and the same is evidence that the problem[s] had not been resolved.

These children have been in foster care a little more than four years. Joshua is now six years old, which means he has spent two-thirds of his life away from his parents in foster care. Jeremy is almost five years old, which means he has spent all but four months of his life in foster care. It is time for these children to move on with their lives. It is time for them to know they have a permanent home. They have spent precious time of their young lives waiting for their parents to grow up. They should not have to wait any longer.

For all these reasons we vacate the court of appeals' decision and affirm the judgment of the district court.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.

SNELL, J., concurs in result.