**In the Interest of A.Y.H., A Minor Child.**

**C.D.H. and R.J.H. III, Mother and Father, Appellants– Cross–Appellees.**

**State of Iowa, Appellee–Cross–Appellant.**

**No. 92–1717.**

Court of Appeals of Iowa.

Sept. 2, 1993.

Gary D. McKenrick of Gomez, May, McKenrick & Kelly, Davenport, for appellant father R.J.H. III.

Janice Roemer, Davenport, for appellant mother C.D.H.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Sp. Asst. Atty. Gen., Charles K. Phillips, Asst. Atty. Gen., William E. Davis, County Atty., and Gerald P. Schutte, Asst. County Atty., for appellee.

Thomas H. Preacher, Bettendorf, guardian ad litem, for minor child A.Y.H.

Heard by SCHLEGEL, P.J., and HAYDEN and SACKETT, JJ., but decided en banc.

HAYDEN, Judge.

C.D.H. and R.J.H. III are the natural mother and father, respectively, of minor child A.Y.H. The parents appeal a juvenile court order terminating their parental rights to A.Y.H. pursuant to Iowa Code sections 232.116(1)(g) and 232.117 (1991). The State cross-appeals, contending C.D.H. voluntarily released her parental rights and the juvenile court failed to terminate her parental rights pursuant to Iowa Code section 232.116(1)(a) (1991).

A.Y.H. was born on May 31, 1989. On August 28, 1989, C.D.H. contacted the Iowa Department of Human Services (DHS). The mother asked DHS to take A.Y.H. from her care and place the child in a foster home. C.D.H. told a DHS social worker she did not want A.Y.H. because she had expected to have a boy. On August 24, 1989, R.J.H.'s probation had been revoked, and he was reincarcerated on August 30, 1989.

A child in need of assistance (CINA) was filed on behalf of A.Y.H. on August 30, 1989. A week later, however, C.D.H. requested A.Y.H. be returned to her. DHS returned A.Y.H. to the custody of C.D.H. in October, at which time DHS began providing services.

On October 20, 1989, DHS made a report of denial of critical care against C.D.H. with regard to A.Y.H. and her sibling, V.T., age two and one-half years. The report noted two reddish-type bruises on A.Y.H.'s forehead and that the children had been left home unsupervised.

On December 8, 1989, A.Y.H. was hospitalized. Doctors diagnosed A.Y.H. as suffering from severe neglect. They noted A.Y.H. had lost over twenty-four percent of her body weight. Several bruises were also found on A.Y.H.'s body. On December 14, 1989, A.Y.H. was discharged from the hospital and placed in foster care. On January 19, 1990, A.Y.H. was adjudicated a child in need of assistance pursuant to Iowa Code sections 232.2(6)(b) and (6)(k) (1989). A.Y.H. has remained in foster care since December 1989.

At the time of A.Y.H.'s removal, R.J.H. was incarcerated following a long history of criminal activity. While he was in prison, R.J.H. did not contact A.Y.H., nor did he talk to her foster care worker. Throughout 1990 C.D.H. had little contact with A.Y.H. She visited the child only fifteen times in 1990. In 1991 R.J.H. was released from prison. He began to visit A.Y.H. and even prevented C.D.H. from voluntarily terminating her parental rights. R.J.H. filed a motion requesting custody be placed with him. The juvenile court denied the motion, and the Iowa Supreme Court affirmed the denial. *In re A.Y.H.*, 483 N.W.2d 820 (Iowa 1992). C.D.H. lost her visitation privileges during this time.

In January 1991 C.D.H. requested her visitation privileges be reinstated. She repeated her request in March 1991. The juvenile court denied her requests. The State petitioned to terminate the parental rights of C.D.H. and R.J.H. The court, however, granted R.J.H. a temporary stay. The court found R.J.H. should be given the opportunity to reunify with A.Y.H. because he had only recently been released from prison. In February 1992, however, R.J.H.'s parole was revoked, and he was returned to prison.

Later a termination hearing was held. On October 21, 1992, the juvenile court entered an order terminating the parental rights of C.D.H. and R.J.H. as to A.Y.H. Both parents appeal.

R.J.H. contends his failure to visit A.Y.H. while he was incarcerated should not be held against him. C.D.H. claims DHS failed to provide adequate services.

■■■ Our scope of review in parental termination proceedings is de novo. Iowa R.App.P. 4. Our primary concern is the best interests of the child. *In re J.K.*, 495 N.W.2d 108, 110 (Iowa 1993). Those best interests include the child's long-range as well as immediate interests. *Id.* We look to what the future likely holds for the children if returned to their parents. *Id.* The parents' past performance is the best evidence for this determination because past performance is indicative of the quality of future care the child may receive. *Id.* (citing *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992)).

We address whether clear and convincing evidence supports the termination of C.D.H.'s and R.J.H.'s parental rights.

■ I. The juvenile court stated, in its termination order: "It is clear that the father is not a resource for the child. Due to his continuing criminal behavior, personal problems and lack of commitment to a sufficiently acceptable lifestyle to care for his child, return of the child to his custody is not possible." We adopt these findings as our own. R.J.H.'s criminal history has included first- and third-degree theft, numerous fraudulent activities, and several traffic violations. Less than two months after A.Y.H.'s birth, R.J.H. was arrested for operating while under the influence. R.J.H.'s probation was subsequently revoked, and he was reincarcerated in August 1989. While incarcerated, R.J.H. was charged for first-degree theft in connection with fraudulent collection of his grandmother's social security checks. R.J.H. was released on parole in January 1991. By February 1992, however, R.J.H. was back in prison due to violations of his parole. The parole revocation was based on R.J.H.'s writing of thirty-seven bad checks totaling over $5000. R.J.H.'s actions and attitude show a failure to mature and assume responsibility. A parent's past performance may be indicative of the quality of future care the parent may provide for the child. *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (citing *In re L.L.*, 459 N.W.2d 489, 493–94 (Iowa 1990)).

■ C.D.H. has shown a pattern of disregard toward the welfare of A.Y.H. She has made several attempts to give up A.Y.H. for adoption. C.D.H. has failed to recognize her problems or work toward improving her parenting skills. C.D.H. has a history of terminating services sponsored by DHS. The incidents of severe nutritional deprivation and extensive bruising suffered by A.Y.H. are illustrative of C.D.H.'s lack of concern for her child. The disregard C.D.H. has shown toward A.Y.H. cannot continue. The best interests of the child demand she not be returned to the harmful atmosphere from which she was removed. *In re Dameron*, 306 N.W.2d 743, 747 (Iowa 1981).

■ II. DHS must make reasonable efforts to reunify the family and provide services. Iowa Code § 232.102(5) (1991). The record shows DHS established a case plan for C.D.H. and her family, identified problems within the family unit, and provided extensive services to C.D.H.

This record contains clear and convincing evidence to support a finding DHS made reasonable efforts to reunify this family. Upon R.J.H.'s release from jail in January 1991, DHS began supervised visitations between R.J.H. and A.Y.H. In February 1992, however, R.J.H.'s parole was revoked, and he was returned to prison. R.J.H.'s continuing criminal behavior, personal problems, lack of commitment to an acceptable lifestyle, and inability to provide a stable environment for A.Y.H. support a termination of his parental rights.

DHS became involved with C.D.H. on August 28, 1989, at which time she requested A.Y.H. be placed for adoption. DHS subsequently removed the child from the home and arranged for supervised visitations. C.D.H. missed some of the scheduled visits. DHS also arranged a psychological evaluation of C.D.H. and two or three subsequent sessions.

In October 1989 A.Y.H. was returned to C.D.H. DHS initiated family preservation services immediately. The organization arranged for her to join a mother's support group and provided transportation to the group meetings and other appointments. Family preservation withdrew its services on December 1, 1989. DHS initiated visiting nurse and homemaker services for C.D.H. on December 5, 1989. A family life specialist worked weekly with C.D.H. on parenting and child development. On March 26, 1990, C.D.H. requested this organization's services be terminated. The record shows C.D.H. has shown a lack of participation and commitment to the services offered to her.

Following A.Y.H.'s release from Mercy Hospital on December 14, 1989, she was placed into foster care. A.Y.H. remained in foster care throughout 1990. DHS continued to provide supervised visitations. C.D.H., however, attended only fifteen visitations during 1990.

Bethany Homes accepted responsibility for this case on March 14, 1990. The organization's services included supervised visitations, nurturing/parenting modeling, and problem-solving techniques. C.D.H. missed scheduled visitations on March 21 and 28, 1990. She resumed visitation on April 4, 1990, after being confronted regarding the consequences of her lack of visitation. From the end of March to the end of May C.D.H. missed five appointments with the Bethany Homes caseworker. The caseworker noted C.D.H. refused to work on parenting skills. Bethany Homes also tried to persuade C.D.H. to attend a woman's support group sponsored by Catholic Social Services, but she refused to attend. During the six months Bethany Homes was involved in this case, C.D.H. visited A.Y.H. ten of the total fifteen visits during 1990. C.D.H. had the opportunity for forty-one visitations; however, she attended only twenty-four percent of the scheduled visitations. On May 3, 1990, C.D.H. discontinued her visitation. A Bethany Homes caseworker visited C.D.H.'s home on May 7, May 18, and May 21 in an attempt to solicit her participation in visitation. C.D.H. eventually discontinued these services and had no contact with Bethany Homes from October 1990 until January 1991.

■ After a thorough review of the record, we find clear and convincing evidence supports termination of parental rights. The record reveals DHS provided C.D.H. with extensive services and gave her time to develop her parenting skills. She has failed to consistently use the services offered and has discontinued several DHS programs. Both parents' lack of progress raises serious concerns about their ability to meet the needs of their child in the future. The amount of patience for C.D.H.'s and R.J.H.'s actions must be reasonably limited because "patience with parents can soon translate into intolerable hardship for their children." *In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987), *cert. denied sub nom A.C. v. State,* 485 U.S. 1008, 108 S.Ct. 1474, 99 L.Ed.2d 702 (1988).

We hold the termination of C.D.H.'s and R.J.H.'s parental rights to A.Y.H. is sup-ported by clear and convincing evidence. The best interests of A.Y.H. warrant the termination of parental rights. We affirm the decision of the juvenile court.

Costs of this appeal are taxed one-half to C.D.H. and one-half to R.J.H.

**AFFIRMED.**

All Judges concur except SACKETT, J., who specially concurs.

SACKETT, Judge (specially concurring)

I concur specially. I too would affirm the trial court's decision to terminate the parental rights of Ann's[1] parents. The majority has correctly applied Iowa statutory and case law to the facts of this case in ordering termination.

The majority has also determined that termination of this child's parents' parental rights is in the best interest. On the record before us, I am unable to make a determination of whether termination of her parental rights is in her best interest or is not in her best interest. Furthermore, the record in this case convinces me that while Ann's parents have failed her, the state of Iowa and the system of which I am a part, also, have failed her.

Ann came to the state's attention because her mother, Cathy[2], called the Iowa Department of Human Services asking for services to assist her in caring for Ann. Ann was born in May 1989. Cathy's call to the Department came in August 1989. At the time, Cathy was caring for Ann and Ann's older sister who had been born in December 1986. Ann's father had been sent to prison four days earlier. Cathy, who was just nineteen, had wanted Ann to be a boy. Cathy was alone in the community without family. Ann's father, who was older than Cathy, had been the dominant person in the household. To assist Ann's mother in parenting, Ann was put in foster care for a week and then returned to Cathy's care. Then in December 1989, Ann was hospitalized and determined to be undernourished. When released, Ann

---

1. Ann is not the child's given name. A.Y.H. are the child's initials.

2. Cathy is not the mother's given name. C.H. are the mother's initials.

was again placed in foster care where she remains now, nearly four years later. During this course of time, Ann has been in five foster placements. Ann's trip through the foster care system has been frustrated in a number of ways. An initial worker assigned to Ann's case worked toward family reunification. A subsequent worker did not work toward reunification, but sought termination. Ann's father, when released from prison, attempted to gain custody of the child. The trial court denied him custody; he appealed and this court reversed and then the Supreme Court vacated our decision. There followed a termination hearing and this appeal. This all took time. Meanwhile, Ann remains in limbo.

Furthermore, our filing of this decision does not guarantee Ann's situation will change. First, the appeal process does not end with this court. Further review by our Supreme Court may be requested and ordered. Secondly, termination does not guarantee adoption. While the record reflects Ann is receiving adequate care from foster parents in a rural Iowa community, these parents are not interested in adopting Ann because she is of African–American descent. The foster parents feel it would be difficult to integrate her in their community. Ann will not be an easy child to place for adoption. There is nothing in this record that convinces me Ann will find a satisfactory adoptive placement. She may well remain in the foster care system until she reaches adulthood.

I don't excuse Ann's parents for their deficiencies but, I note today, they are adequate parents to two of Ann's siblings. One is older than Ann and the second is younger.

I do, however, have special empathy for a young mother attempting to parent two young children with little support. In retrospect, I ask if the result could have been different. Ann's mother was young, poor, caring for two young children and with a husband very recently incarcerated when she called the Department for help. If Ann had not been put in the foster care system but, rather, services had been offered to her mother specifically directed to helping her keep and adequately care for Ann in her home, would Ann still be a part of her biological family and be growing up with her siblings?

When the state removes children from their parent's care and terminates parental rights, I am of the opinion that the state has a serious obligation to assure the child a better situation and failure to meet this obligation should not be excused. I cannot find that state care has given Ann a better life. We cannot change what has happened to Ann. However, no child should spend his or her formative years in a series of foster homes. There currently are programs in this state that work on identifying parents' strengths and helping them parent their children. Perhaps if monies directed to terminating parental rights were directed to these programs, we would better serve the children in this state whose parents experience difficulties in parenting. I cannot find Ann's best interest has been served by this proceeding.