**In the Interest of Nicole, Heather, and Gina BLACKLEDGE, Children.**

**Appeal of Pen EVEN, formerly Pen Blackledge.**

**No. 65251.**

Supreme Court of Iowa.

April 15, 1981.

Isadore Nadler, Waterloo, for appellant.

David R. Zellhoefer of Zellhoefer, Randall & Anfinson, Waterloo, for appellee Thomas Blackledge.

Thomas J. Miller, Atty. Gen., Brent S. Hege, Asst. Atty. Gen., and Allan W. Vander Hart, Asst. County Atty., for appellee State of Iowa.

Considered by LeGRAND, P. J., and UHLENHOPP, McCORMICK, ALLBEE and SCHULTZ, JJ.

McCORMICK, Justice.

This is an appeal from an order entered after a review hearing in a child-in-need-of-assistance (CHINA) proceeding. The juvenile court refused to return the two children involved to their mother's home. Instead it transferred their custody to their father, Thomas Blackledge, and extended their placement for one year. The mother, Pen Even, contends the court order was an unauthorized modification of the custody award in the dissolution decree. She also contends she met her burden to prove that the children should be returned to her home. We reverse and remand.

We review the evidence de novo. *In Interest of Welcher*, 243 N.W.2d 841, 843 (Iowa 1976). The children involved are Gina and Heather Blackledge. They were born in Thailand, Gina on January 28, 1974, and Heather on February 27, 1975. Pen was a native of Thailand who married Thomas Blackledge while he was stationed there with the air force. Although Thomas denied paternity of Gina in the present proceeding, he is listed as her father on her birth certificate. In addition, he acknowledged paternity in the Black Hawk County action in which his marriage to Pen was dissolved in March 1978. The juvenile court found in the present action that he is the father of both children, and he does not contest that finding.

Thomas was transferred to Taiwan where the family lived until April 1977. At that time a transfer within Taiwan made it possible for him to move his dependents to the United States at government expense. He took thirty days leave, brought Pen and the two children to Waterloo, and returned to Taiwan.

Pen had some understanding of English but could not read or write it. She knew no one in Waterloo other than three brothers of Thomas who looked in on her occasionally. Thomas had made a downpayment on a contract for purchase of the home in which she resided with the children. She received a $325 monthly military allotment.

Thomas said that because he subsequently learned Pen was "messing around" he stopped sending money for the house payment. Pen attempted to keep the home by making the house payment one month and the utility payment the next. She also sold furniture to obtain funds. Finally, she gave up the rest of her furniture as a house payment. When she was unable to make additional payments she lost the home.

She obtained ADC and lived in several rented homes in Waterloo. When Thomas returned to this country for two weeks in January 1978, he and Pen decided to end their marriage. She initiated a dissolution action which resulted in a March 1978 decree adopting a stipulation of the parties. Pen was awarded custody of the children. Thomas was ordered to pay $250 a month child support.

Pen became pregnant and gave birth prematurely on September 11, 1978, to her third daughter, Nicole. She subsequently moved to the Jesup home of Nicole's father. He charged Pen $200 a month for subsistence and $100 a month for use of his car. She became increasingly depressed and desperate.

In June 1979 a department of social services (department) caseworker discovered Gina and Heather had scratches and bruises which Pen told her she had inflicted by spanking them with a switch. The department continued to provide homemaker and home health aid services. Finally, on August 15, 1979, Pen brought the children to the department office in Independence. She said she was depressed and upset and could no longer cope with her situation. She asked the department to take the children so she could enter the Independence mental health institute. The department took the children, and Pen entered the hospital. On the next day she left and asked that the children be returned to her. The department obtained an emergency order for custody.

Subsequently the present CHINA proceeding was initiated on the petition of an assistant county attorney. He alleged the grounds in section 232.2(5)(b), (c)(2), and (g):

5. *"Child in need of assistance"* means an unmarried child:

.        .        .        .        .

b. Whose parent, guardian or other custodian has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.

c. Who has suffered or is imminently likely to suffer harmful effects as a result of:

.        .        .        .        .

(2) The failure of the child's parent, guardian, or custodian to exercise a reasonable degree of care in supervising the child.

.        .        .        .        .

g. Whose parent, guardian, or custodian fails to exercise a minimal degree of care in supplying the child with adequate food, clothing or shelter and refuses other means made available to provide such essentials.

He averred in the petition "that the parent has neglected the children, or is imminently likely to neglect the children, that the parent fails to exercise a reasonable degree of care in supervising the children and parent fails to exercise a minimal degree of care in supplying the children with adequate food, clothing or shelter."

The petition was heard on August 24, 1979. The only witness was the social services caseworker. She testified concerning her contacts with Pen. She said Pen was still depressed, her parenting skills and child care had been deteriorating, the children were not being cared for adequately, and she did not believe Pen could immediately resume their care. The caseworker had been in contact with Thomas Blackledge who was then stationed in Colorado Springs. He appeared at the hearing through counsel and was granted permission to participate in the action. The juvenile court adjudicated the children to be in need of assistance and ordered them retained in temporary foster care pending a dispositional hearing two months later.

The dispositional hearing was held on October 26, 1979. A department receptionist who had been a friend of Pen's for two years testified in her behalf. She had been in Pen's various homes approximately twenty-five times. She said the homes were neat and clean and the children well cared for. She attributed the problem in August to the fact Pen had been beaten several times and was physically and emotionally exhausted. A letter from an income maintenance worker for the department was received. He said:

I ... have had contact with Mrs. Blackledge on numerous occasions both in and out of her home. The home was always very neat and clean and the children were neat and well groomed. Mrs. Blackledge's relationship with her children appeared to be very good with affection being displayed by the family for one another. Mrs. Blackledge also cared for my children on several occasions while my wife and I were out. My children had a very high regard for her and praised both [her] and her children highly.

It is my opinion that the children's well being would be best served by leaving them in the Mother's custody.

At the time of the hearing, Pen was enrolled in a class at Hawkeye Tech relating to parenting skills. She had attended an English class there for a short time before Nicole's birth. Pen was living with Francis Even on an acreage in Waterloo. He is a John Deere factory worker whom she had met approximately three months earlier. Francis testified he and Pen intended to marry. He has visitation rights with three children from a prior marriage. He testified Pen had no problem caring for his children during their visits. He supported her custody claim and expressed his wish to have her children in the home.

Thomas testified concerning his background, his marriage to Pen, and his subsequent marriage to a native of Taiwan. He had one child in the new marriage. He said

he wanted custody of Gina and Heather. He told an investigating social worker that he previously believed "that he should stay away from them and let them adjust to their new life so he tried not to interfere." He said, however, he now believed Pen could not care for them without much support and he wished to have their primary care.

A predisposition report and social case history was received and considered by the court. It referred to sibling rivalry and disciplinary problems with Gina and Heather which had subsided during foster care. It also detailed the difficulties Pen had encountered in attempting to make a home for the children since coming to this country.

The court found that Pen was incapable of resuming the care of Gina and Heather at that time. It awarded their custody to the department for placement with Thomas. The court also awarded Nicole's custody to the department for placement in foster care. A review hearing concerning Nicole was scheduled for January 1980, with the intention of returning her to Pen at that time if her situation was stable.

The review hearing for Nicole was held February 2, 1980. She had been returned to Pen on a trial basis in January. Upon recommendation of the department, Nicole was formally placed with Pen, subject to supervision by the department. Pen and Francis Even had married in December 1979. A review hearing concerning placement of all three children was scheduled for May 1980.

Seven witnesses in addition to Pen and Francis testified in the May hearing. A teacher of preschool handicapped children had provided services to Nicole for possible problems associated with her premature birth. She lauded Nicole's progress and the parenting abilities of Pen and Francis. The department's supervisory social worker in Waterloo testified that the Even home was orderly and clean, and Nicole was being cared for adequately. She said she could not say Pen had any problem with parenting. Although she had only seen Pen inter-

act with Nicole, she knew of no reason Pen could not care for more than one child.

A Buchanan County deputy sheriff who had become acquainted with Pen at the time of the August 1979 difficulties had continued to see her since then. He testified to the improvement in her mental and physical condition. The Buchanan County sheriff also testified. He and his wife had been Nicole's foster parents. He visited in the Even home after Nicole's return. His testimony concerning Pen's parenting abilities was favorable. In his opinion the conditions in which Pen had been abandoned in this country made more difference in her ability to care for her children than the fact she had to care for three children. A neighbor and a babysitter also testified favorably concerning the Even home and Pen's parenting.

Pen and Francis testified about the events which had occurred since their marriage. Pen told of difficulties in attempting to communicate with Gina and Heather by telephone. She said she loved her children and wanted them returned to her. She was disturbed that they had been placed with Thomas. Francis testified that he wanted Gina and Heather in his home and would support them. He said Pen was taking several courses at Hawkeye Tech, including English and math. He also described his home and its suitability for the children.

The caseworker from Independence who supervised the placements recommended that full custodial rights to Nicole be returned to Pen. However, she testified about a Colorado caseworker's favorable reports concerning the care being given Gina and Heather in their father's home. In addition, she expressed reservations about Pen's ability to care for all three children. She had made six home visits since Nicole's return. The only problem she encountered related to her disapproval of the Evens' taking Nicole with them late at night when they participated in a bowling league. Even though a sitter service was available at the bowling alley so Nicole could sleep or play, the social worker believed Nicole's

sleep should not be disrupted. Francis testified this practice stopped as result of the social worker's criticism. Nevertheless, the social worker said Pen's adequate care of Nicole and amenability to advice did not mean she was necessarily able to care for all three children. In her opinion Pen was not ready for that.

Subsequently the court entered its order. The court found that the basis for its original CHINA adjudication was still valid. The order provided:

> Although the natural mother has made great strides with regard to the Juvenile Nicole Blackledge, the evidence is clear that the natural mother is unable to resume custody of these children at the present time. In addition, the evidence clearly shows that Gina and Heather are making very good progress in their present placement and that said placement is well suited to their best interest. Therefore, the Court concludes that pursuant to Iowa Code Section 232.102(1)(a) that care, custody and control of Gina and Heather Blackledge should be transferred to their father, Thomas Blackledge, with supervision by the Iowa Department of Social Services.

The court ordered custody of Nicole returned to Pen, with supervision by the department. Another review hearing was ordered for May 22, 1981. This appeal is from the May 1980 order.

I. *The custody award to Thomas.* Pen contends the May 1980 order constituted an unauthorized amendment of the dissolution decree which awarded Gina and Heather's custody to her. She points out that under section 232.63 a noncustodial parent is estopped from seeking a change of custody while a CHINA proceeding is pending. She argues that the CHINA proceeding became a custody dispute and the court's order was a step toward a permanent award of custody to Thomas, in contravention of the statute.

The State insists that the juvenile court simply made a transfer of custody as it was authorized to do under section 232.102(1):

> "After a dispositional hearing the court may enter an order transferring the legal custody of the child to one of the following for purposes of placement:
> a. A relative or other suitable person."
> . . . .

The principal deficiency in the State's contention is that the transfer was not made in a dispositional order. Instead it followed a review hearing held pursuant to section 232.102(6), which provides:

> The duration of any placement made after an order pursuant to this section shall be for an initial period of six months. At the expiration of that period, the court shall hold a hearing and review the placement in order to determine whether the child should be returned home, an extension of the placement should be made, or a termination of the parent-child relationship proceeding should be instituted. The placement should be terminated and the child returned to his or her home if the court finds by a preponderance of the evidence that the child will not suffer harm in the manner specified in section 232.2, subsection 5. If the placement is extended, the court should determine whether additional services are necessary to facilitate the return of the child to his or her home, and if the court determines such services are needed, the court shall order the provision of such services.

Under this provision, the court had three alternatives after the review hearing. It could return the children, extend the placement, or initiate a termination proceeding. A new transfer of legal custody is not among the alternatives.

Modification of a dispositional order is provided for in section 232.103. Even when a court wishes on its own motion to modify the order, unless hearing is waived, the change may be made only after notice and hearing. § 232.103(3). No such notice and hearing were provided in this case.

Thus Pen is correct in her contention that the juvenile court erred in transferring Gina and Heather's custody to Thomas in the May 1980 order. However, we find the

order was wrong because it was entered without notice and hearing. We do not find it was an unauthorized step toward modification of the dissolution decree.

Although the wisdom of a particular order placing children with a noncustodial parent for a prolonged period may be questionable, the juvenile court has authority to transfer custody to the noncustodial parent after a dispositional hearing or modification proceeding. Any such placement is subject to the constraints in section 232.102, including the goal of returning the child to the original custodian as quickly as possible. *See* § 232.102(5), (6).

II. *The merits of the review hearing.* When a parent seeks return of a child removed as the result of a CHINA adjudication, the parent has the burden of proving by a preponderance of evidence that the child will not suffer harm if returned to the home. *Welcher,* 243 N.W.2d at 844. The harm which must be negated is specified in section 232.2(5). *See* § 232.103(2)(b). It consists of the grounds for adjudicating a child to be in need of assistance. Ordinarily the relevant grounds in the review hearing will be those on which the adjudication was based. Although the court did not specify the grounds on which the adjudication was made in the present case, we will assume they were the grounds alleged in the petition.

From our review of the evidence we are persuaded Pen met her burden of proof. The principal cause of the conditions which led to removal of the children was social. Pen was set adrift in a strange country as a single parent with two young children. She was largely on her own in a fight for survival. She did not know where to turn for help and her situation deteriorated. Economic hardship and the birth of her third child increased the pressure. It is not difficult to see why she became emotionally exhausted and depressed. However, after the crises in August 1979 when she asked the department for help, her situation steadily improved.

Her new marriage appears to be stable. Her husband has a history of steady employment and a good income. He is devoted to her and Nicole and wishes to have Gina and Heather in the home. Pen has received supervision and advice concerning parenting and homemaker skills. She is learning to read and write English and has taken courses for self-improvement. She has made friends among people who support and encourage her.

The juvenile court's principal reservation about returning Gina and Heather to her was based on uncertainty concerning her ability to handle three children as opposed to one. In light of all the present circumstances, including her care of Nicole, no reason exists for believing she could not care for all three children.

The legislative intent is that children be kept in their homes when possible. § 232.1. The integrity of the family must be taken seriously. *See In Interest of Wall,* 295 N.W.2d 455, 457 (Iowa 1980). Courts are obliged to utilize the "least restrictive disposition appropriate considering all the circumstances of the case." § 232.99(3). When a child is removed from the home, services are provided to the parent to facilitate the child's return. When the evidence shows the return will not produce harm, the child is to be reunited with the parent. In the present case Pen offered persuasive evidence of self-improvement and success in caring for Nicole. It could not fairly be said that if the children were returned to her they would be in danger of imminent neglect, of harmful effects from inadequate supervision, or of lack of minimally adequate food, clothing and shelter. *See* §§ 232.2(5)(b), (c)(2), and (g).

Unfortunately the court's decision seems to have been influenced by a comparison of Pen's home with the father's. This is apparent in the court's finding "that Gina and Heather are making very good progress in their present placement and that said placement is well suited to their best interests." Presumably every foster home will provide good care. The parent's right to have a child returned, however, is not measured by

comparing the parent's home to the foster home or an ideal home. Rather the parent's right is established by negating the risk of recurrence of harm. We conclude that Pen made the necessary showing here. The juvenile court erred in holding otherwise. The children should have been returned to Pen in May 1980.

Upon remand the court shall hold a hearing to determine present conditions. Unless the situation has materially and adversely changed from that shown in the May 1980 hearing, the court shall order Gina and Heather returned to Pen's home with appropriate provisions for supervision. *See Welcher,* 243 N.W.2d at 845.

REVERSED AND REMANDED.