# IN THE COURT OF APPEALS OF IOWA

No. 18-1029
Filed September 26, 2018

**IN THE INTEREST OF B.M.,**
**Minor Child,**

**L.O., Mother,**
            Appellant.

_____

        Appeal from the Iowa District Court for Sioux County, Robert J. Dull, District

Associate Judge.


        A mother appeals the termination of her parental rights to her one-year-old

child.  **REVERSED AND REMANDED**.


        Jacqueline L. Grotewold of McGill, Murphy, Collins & Bixenman, PLC, Rock

Valley, for appellant mother.

        Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney

General, for appellee State.

        Philip J. De Koster of De Koster & De Koster, PLLC, Hull, guardian ad litem

for minor child.


        Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

The guardian ad litem (GAL) for one-year-old B.M. filed a petition to terminate the parental rights of the child's mother, Lacey.[1] At the combined permanency and termination trial, the State's only witness was B.M.'s foster parent. In terminating Lacey's parental rights, the juvenile court emphasized "the stability and care [B.M.] needs and deserves can best be supplied by his current foster parents, who desire to adopt him." After carefully reviewing the record, we find the State failed to prove the statutory grounds for termination by clear and convincing evidence. Accordingly, we reverse the termination order and remand to the juvenile court.

## I.     Facts and Prior Proceedings

The Iowa Department of Human Services (DHS) took notice of this family in March 2017 after allegations the parents were using illegal drugs. Robert, named as B.M.'s father on the birth certificate, admitted he was injecting methamphetamine and Lacey was smoking marijuana.[2] The juvenile court entered an order temporarily removing B.M.—then two months old—from his parents' care and placed him in the custody of the DHS. The court adjudicated B.M. as a child in need of assistance (CINA) as defined by Iowa Code section 232.2(6)(b), (c)(2), and (n) (2017).

---

[1] The legislature listed the GAL as one of the parties who may file a termination petition. Iowa Code § 232.111 (2018). After the petition is filed, the county attorney is generally charged with presenting evidence in support of the petition. *Id.* § 232.114; *see Crowell v. State Pub. Def.*, 845 N.W.2d 676, 680 n.1 (Iowa 2014).

[2] Robert was incarcerated during most of the child-welfare proceedings and does not appeal the court's termination ruling.

Following B.M.'s removal, the court ordered Lacey to undergo a substance-abuse evaluation and participate in DHS recommended services including: Family Safety, Risk, and Permanency (FSRP) assistance, random drug testing, and substance-abuse treatment. The DHS offered Lacey fully supervised two-hour visitation with B.M. once per week. Lacey, who was twenty-one-years old, moved into her parent's home in June 2017 and regularly attended visitation with B.M. But she was an inconsistent participant in other services, missing an average of two substance-abuse treatment appointments per month during the summer of 2017.

At a review hearing in August, the GAL offered his opinion Lacey "had not taken significant steps to address her substance abuse and mental health issues since the last hearing" and had not made measurable strides in demonstrating her ability to care for B.M. The GAL also expressed concern that Lacey focused on continuing a relationship with her former boyfriend Robert rather than caring for B.M. But the DHS report submitted at the same hearing cast Lacey's progress in a more favorable light, describing her as "responsive" to B.M.'s needs, "even though she may not know how to appropriately attend to his needs." The DHS also reported Lacey provided necessary supplies for B.M. during visits and used the skills she was learning during individual sessions with her son. In its dispositional order, the juvenile court noted Lacey recognized her relationship with Robert was "toxic." Nevertheless, the court accepted the GAL's view that Lacey was not addressing her "parenting deficiencies." The court continued the proceedings and scheduled a permanency hearing for November.

Lacey participated in substance-abuse and mental-health treatment until her insurance lapsed in the fall of 2017. An FSRP progress report written in October stated "Lacey was actively working to make changes in her life." A drug treatment center also reported Lacey had nine consecutive negative drug tests dating back to June. Lacey consequently requested an increase in visitation with B.M. and DHS obliged, providing two hours of semi-supervised visitation three times per week at her residence. DHS also reported Lacey was "able to parent [B.M.] appropriately during visitations . . . [with] minimal prompting and suggesting . . . ."

A family case plan prepared by DHS for the November permanency hearing reported, "[T]here are no immediate safety concerns pertaining to [B.M.'s] care," and Lacey "has demonstrated she is open to suggestions to parenting, and can absorb what she is taught over time." The family case plan further found Lacey achieved "significant" progress "on parent skill building . . . [i]t would now appear that Lacey is motivated to have [B.M.] in her care, and is willing to comply with the services necessary to achieve this goal." The report concluded by recommending an additional six months of time to allow Lacey to work towards reunification with B.M.

In contrast, a report submitted by the GAL before the November hearing alleged "Progress in this case has been perilously slow" but "we have an amazing foster family here." Citing a "lack of focus" by Lacey, the GAL said he was "hopeful" Lacey's "new habits" would continue, but was "not convinced that [was] certain." The GAL expressed dissatisfaction with DHS's recommendation for a six-month extension. The GAL recommended the court direct the State to file a termination

petition in early February if reunification had not occurred by then. The juvenile court's November disposition order concurred with the recommendations in the DHS family case plan with one additional finding—despite reasonable efforts, it remained contrary to B.M.'s best interest to return to parental custody. The court set a permanency hearing for May 2018.

Lacey resumed mental-health and substance-abuse treatment immediately following the November permanency hearing. In January 2018, she again requested increased visitation. The GAL resisted, arguing "Lacey does not identify how increased visitation would be in [B.M.'s] best interest or how it would help her respond to the various services offered by the DHS and assist her in being a better parent." The GAL also asserted, "Although Lacey has remained clean, significant other issues exist which would likely result in continued harm to [B.M.] should either increased visitation or reunification occur." The GAL again cited Lacey's "lack of focus" and "inability to make the changes in her life necessary for proper parenting."

The juvenile court set a February 15 hearing on Lacey's motion for increased visitation. On February 4, the DHS authorized longer interactions and overnight visitation between Lacey and B.M. Ten days later, the GAL filed a petition to terminate parental rights, citing paragraphs (e), (h), and (*l*) of section 232.116(1). As factual support, the GAL listed Lacey's lack of overnight visits with B.M.; her failure to address "her own recovery" and her inclination to "place blame" on others, including social workers and the foster parents; her failure to regularly participate "in [Narcotics Anonymous] and other substance abuse treatment" and "although remaining drug free" her recent positive test for alcohol; her lack of

reliable transportation; her lack of employment; and generally that she was "not ready to fully assume the role of being a parent as she has not sufficiently addressed her mental health needs, substance abuse issues, codependency issues, and has not demonstrated the requisite parenting skills."

The court did not hold the scheduled February 15 hearing on Lacey's request for expanded visitation. But DHS approved two overnight visitations; the second of which occurred February 21. When the FSRP worker dropped off then one-year-old B.M., she raised concerns with Lacey and her mother that a space heater in the house presented a danger because B.M. was starting to crawl. The FSRP worker also addressed safety concerns about cables running from the entertainment center, wall outlets, and a dog's tennis ball B.M. had placed in his mouth. Based on these issues, the FSRP supervisor directed the worker to end the overnight visit at 8 a.m.—several hours earlier than scheduled.

Lacey continued to regularly attend treatment for substance abuse and mental health and participate in semi-supervised visitation. The final DHS update noted Lacey was ready for increased visitation until mid-January, when she began to regress. The report further described Lacey as "responsive and well bonded to [B.M.] and his needs." Again by contrast, the final GAL report recommended termination, in part, due to the GAL's belief Lacey did not have a strong bond with B.M. The GAL asserted B.M. was more bonded with the foster family, citing an instance where B.M. hurt his head and expressed a "clear preference" for his foster mother over Lacey despite both individuals being present. The GAL stressed Lacey's inability to recognize safety concerns and her "questionable" mental health.

The juvenile court held a combined permanency and termination hearing in May 2018. The State called one witness—B.M.'s foster father, who discussed B.M.'s bond with the foster family and their desire to adopt him. The State also submitted eight exhibits: (1) a May 2018 report from Lacey's substance-abuse and mental-health counselor tracking her overall progress; (2) a February 2018 email from the counselor noting a positive test for alcohol; (3) a list of calls Robert made to Lacey from jail dating from August through November 2017; (4) text message exchanges between Robert and Lacey in January and February 2018; (5) FSRP reports; (6) B.M.'s speech-therapy records; (7) the DHS family case plan; and (8) the GAL report.

Lacey's attorney called four witnesses: Lacey, the DHS caseworker, the FSRP worker, and Lacey's mother. The DHS worker described the progression of the case as "a roller coaster ride" with Lacey initially struggling, then "grabb[ing] onto the skills that she learned," and finally becoming disillusioned in the two months leading up to the termination hearing. The DHS worker testified she had safety concerns about reuniting B.M. with his mother, but then clarified that her concerns focused on "the mere financial aspect of Lacey's ability to care for him and his basic needs." The FSRP worker testified Lacey was "earnestly trying to do what she needed to do" until February when her motivation dissipated. When asked if B.M. could be reunited with Lacey at the time of the termination hearing, the FSRP worker said she was "not qualified to answer that." Lacey testified she had been living with her parents for about one year and planned to do so until she could "get back on her feet." She was in the process of applying for disability benefits. She also intended to take the necessary course to reinstate her

driver's license. Lacey testified she was attending substance-abuse treatment "religiously," in addition to seeking mental-health therapy, and following her medication management regime for her diagnosed anxiety. Lacey testified she had been consistently asking for increased visitation and the overnight sessions with B.M. went well, though she recognized the FSRP worker's safety concerns. Lacey testified B.M. had never suffered an injury during visitation. Lacey's mother also addressed the safety concerns raised about her home, noting she has three other young grandchildren who visit without incurring harm.

The juvenile court terminated Lacey's rights under paragraphs (h) and (*l*) of section 232.116(1). The court made no finding regarding the GAL's request for termination under paragraph (e). The entirety of the juvenile court's analysis appears in the following paragraph:

> While it initially appeared the services being offered to Lacey were having some success in correcting the need for [B.M.'s] continued removal from her care, over the past few months there has been a regression, and it continues to be contrary to [B.M.]'s best interest to consider returning him to his mother despite her protestations to the contrary. She is unemployed, has no residence of her own, and has no driver's license. She is incapable of caring for [B.M.] on her own. Without a significant change in her situation and an extended period of stability and independence, it will remain contrary to [B.M.]'s best interest to consider returning him to her care, and that period cannot be predicted to happen in the foreseeable future.

The court concluded its termination order by stating, "[B.M.] is a child who has been taken in by a responsible, stable family and has become a member of that family."

Lacey now appeals.

## II.     Scope and Standard of Review

The Due Process Clause ensures the custody and nurture of a child reside first in the parents.  *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (explaining due process would be offended if the State tried to "force the breakup of a natural family" without "some showing of unfitness and for the sole reason that to do so was thought to be in the child's best interest").

We review termination-of-parental-rights proceedings de novo.  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).  The juvenile court's factual findings are not binding, but we give them weight.  *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).  We will uphold an order terminating parental rights only if clear and convincing evidence supports one of the statutory grounds.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  Clear and convincing "is the highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence."  *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016).  We impose this significant burden on the petitioning party "to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interest" in raising his or her child.  *Id.*

## III.     Analysis

Lacey challenges both grounds for termination cited by the juvenile court. Termination of parental rights is proper if any one of the cited grounds are supported by clear and convincing evidence.[3]  *In re J.B.L.*, 844 N.W.2d 703, 704

---

[3] Although we may affirm a termination of parental rights on any grounds alleged in the petition, the State does not present an argument termination was proper under paragraph (e) of Iowa Code § 232.116(1).  *See M.W.*, 876 N.W.2d at 221.  Accordingly, the State

(Iowa Ct. App. 2014). We turn first to section 232.116(1)(h), which requires the State to prove four elements:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h).

Lacey challenges the State's proof of the fourth element, claiming the juvenile court erred in concluding B.M. could not be returned to her custody at the present time. She contends she is able to care for B.M. appropriately and provide a home for herself and the child.

The burden rests with the State to show by clear and convincing evidence B.M. would suffer harm if returned to Lacey's care. *See J.R.*, 478 N.W.2d at 412; *In re Chad*, 318 N.W.2d 213, 219 (Iowa 1982). Section 232.102(6)(a)(2) defines maltreatment warranting removal from a parent's home as "some harm which would justify the adjudication of the child" as a CINA. *See* Iowa Code § 232.2(6). "The threat of probable harm will justify termination, and the perceived harm need not be the one that supported the child's initial removal from the home." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992). "Termination must only occur where more harm is likely to befall the child by staying with his or her parents than by being

---

has abandoned any argument paragraph (e) is a proper ground for termination of Lacey's parental rights.

permanently separated from them." *In re H.H.*, 528 N.W.2d 675, 677 (Iowa Ct. App. 1995).

The State and GAL expressed concern about potential harms to B.M. that fall into two categories: (1) Lacey's inability to financially support and care for her son and (2) vague allegations Lacey cannot provide adequate supervision because of a "lack of focus." The State's evidence in support of these concerns did not satisfy the clear-and-convincing standard required for termination.

A main impetus for B.M.'s removal was Lacey's drug abuse. But at the time of the termination hearing, Lacey had not tested positive for controlled substances in twelve months.[4] Lacey testified she was regularly taking her anxiety medication as prescribed. The evidence available at the termination hearing showed Lacey was following the DHS case permanency plan and largely had been successful in creating a stable, consistent home environment for B.M.

On the question of financial support, we reiterate termination of parental rights cannot be based on economic factors alone. *See A.M.*, 843 N.W.2d at 111. At the time of removal, Lacey was being evicted from her apartment, was unemployed, and lacked reliable transportation. Thereafter, she moved in with her parents who were welcoming, supportive, and had sufficient space for both Lacey and B.M. Her parents also helped her with transportation to appointments. Lacey applied for numerous jobs but was unable to secure employment by the time of termination. To support herself, Lacey applied for public benefits.

---

[4] Lacey did have one positive test for alcohol in January 2018—when she was twenty-one years old. She testified she went out with friends for "a couple drinks." She also testified the DHS workers had never voiced concern about her alcohol use.

The State presented no evidence showing a lack of means prevented Lacey from providing the food, shelter, clothing, toys, or other supplies necessary for B.M.'s well-being. Single parents frequently reside with relatives as a means to ease financial burdens. *See In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) (suggesting a parent's decision to rely on relatives for help can be a positive factor in assessing protective abilities). Poverty would become a de facto cause for termination if removal was warranted solely because Lacey could not afford a "residence of her own" or based upon the DHS worker's singular concern for the "financial aspect of Lacey's ability to care for [B.M.] and his basic needs."

We are also troubled by the allusions in this record that more resources would be available to B.M. if he was adopted by the foster family. For instance, at the termination trial, the county attorney questioned the foster father concerning his employment as a pastor, the number of bedrooms in his home, and his health insurance coverage. "The parent's right to have a child returned . . . is not measured by comparing the parent's home to the foster home or an ideal home." *In re Blackledge*, 304 N.W.2d 209, 214–15 (Iowa 1981). Evidence a parent does not meet an "ideal" standard for economic independence does not satisfy the State's weighty burden of proving a child would suffer adjudicatory harm if returned to the parent.

The second risk category cited by the GAL and State precluding reunification was Lacey's "lack of focus" when caring for the child. The juvenile court found Lacey was "incapable of caring for [B.M.] on her own." The court did not offer a factual basis for its finding or pinpoint what circumstances rendered her incapable of raising her son. In our de novo review of the record, we do not find

clear and convincing evidence Lacey is incapable of caring for B.M. without DHS supervision.

An FSRP report from January 2018 described Lacey as "consistent in her visits" and "responsive and well bonded" with her son. The report noted she provided "necessities" during visits and used the parenting skills she had been taught. This report—dated only a few weeks before the GAL filed the petition for termination—undermines the juvenile court's conclusion Lacey could not appropriately supervise B.M. The FSRP report also followed the DHS recommendation for a six-month extension for reunification. Lacey was allowed significant time at home with B.M. supported by limited "drop-ins" from the FSRP worker. She also sought additional visitation including overnight stays. Only the GAL disagreed with the assessment of Lacey's progress

Shortly after the termination petition was filed, the FSRP worker ended an overnight visitation early and the DHS revoked future overnight visitation citing "continued safety concerns." At the termination hearing, the FSRP worker testified her safety concerns had been "addressed" but not necessarily "corrected." But the only instance of harm mentioned in the DHS worker's testimony involved Lacey taking a photograph of B.M. standing on a rocking chair about ten feet away. The worker recalled reading a report that B.M. fell from the chair and bumped his head, a point disputed by Lacey.

While such individual incidents cited by the DHS may "seem trivial" and other concerns "may appear to be nebulous," our supreme court has emphasized the importance of viewing the evidence in context because we have "limited data points" from which to draw an inference whether a child can be safely returned to

parental care. *A.M.*, 843 N.W.2d at 112. But the "data points" available in this case do not lead to an inference B.M. could not be successfully reunited with his mother. Lacey complied with the DHS recommendations for substance-abuse and mental-health treatment. She had progressed to overnight visitations with B.M. at her parents' home where she was living. The ongoing concerns about child-proofing the home do not rise to the level of clear and convincing evidence of unfit parenting. We find insufficient evidence to support the juvenile court's termination of parental rights based on paragraph (h).

The juvenile court cited paragraph (*l*) as an alternative ground to terminate Lacey's parental rights. Termination under that paragraph is appropriate if:

> (1) The child has been adjudicated a [CINA] pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.
> (2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.
> (3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

Iowa Code § 232.116(1)(*l*).

The legislature defined a "substance-related disorder" as "a diagnosable substance abuse disorder of sufficient duration to meet diagnostic criteria specified within the most current diagnostic and statistical manual of mental disorders published by the American psychiatric association that results in a functional impairment." *Id.* § 125.2(14); *M.S.*, 889 N.W.2d at 679.

Lacey argues the State failed to prove by clear and convincing evidence that she suffers from a severe substance-related disorder, presents a danger to

herself or others, or that her prognosis precludes B.M.'s return to her custody within a reasonable period of time.

The State offered a letter from Lacey's therapist at Seasons Center for Behavioral Health as an exhibit at the termination hearing. The therapist wrote: "Lacey has most recently been diagnosed by her psychiatrist with the following: ADHD, PTSD, persistent depressive disorder, generalized anxiety disorder, amphetamine-type substance abuse disorder, and tobacco use disorder." The State did not present any testimony that Lacey's substance abuse disorder was "severe" or that her prognosis boded poorly for the return of B.M. within a reasonable time. And the juvenile court included no analysis in the termination order addressing Lacey's substance-abuse disorder or her prognosis.

On appeal, the State cites several cases detailing the risks of exposing children to drug abuse. *See, e.g.*, *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children."); *In re J.K.*, 495 N.W.2d 108, 112–13 (Iowa 1993) (finding parent's failure to make significant progress in completing substance-abuse treatment over a two-year period was clear and convincing evidence in support of terminating parental rights). But general statements outlining the dangers of addiction alone are insufficient to show a child is likely to suffer physical harm. *J.S.*, 846 N.W.2d at 41–42.

The record here does not paint a picture of an unresolved addiction. In fact, results of the random drug testing showed Lacey had not used methamphetamine for one year before the termination hearing. A treatment report prepared by her substance-abuse counselor outlined her strides toward recovery:

> Lacey has made many positive changes during her time in counseling services. She has been able to abstain from her use of drugs and alcohol for the past ten months minus her slip in January. Lacey has been able to develop healthier coping skills she utilizes to delay gratification as well as manage mental health symptoms.

The counselor's ongoing concern centered on Lacey's "lack of positive supports" and her need to continue treatment to achieve "long-lasting life changes." At the time of the hearing, the evidence showed Lacey was committed to remaining drug free and was continuing to actively address her substance-abuse related disorder. On this record, we cannot find the State offered clear-and-convincing evidence to satisfy paragraph (*l*).

## IV.    Conclusion

Following our de novo review, we conclude the State failed to prove by clear and convincing evidence any statutory ground for terminating Lacey's parental rights. Accordingly, we reverse the termination order and remand to the juvenile court for further proceedings.

**REVERSED AND REMANDED**

Danilson, C.J., concurs; Vogel, J., dissents.

**VOGEL, Judge** (dissenting)

I respectfully dissent and would affirm the termination of the mother's parental rights under Iowa Code section 232.116(1)(h) (2018). I believe the State proved by clear and convincing evidence B.M. could not be returned to the care of the mother, Lacey, at the time of the termination hearing.

While Lacey initially made progress in addressing concerns about her parental ability, the record shows that progress slowed or even reversed in the weeks preceding the termination hearing on May 24, 2018. The DHS worker testified that by February Lacey "was not complying [with] the recommendations nor trying to change the current situation." She further testified that since February Lacey "rejects or is argumentative about any recommendations made by FSRP or myself to ensure [B.M.'s] safety pertaining to the cleanliness of the home, . . . pertaining to the level of supervision needed, pertaining to basic suggestions . . . of how to build a bond and how to bond." She "rarely observed" Lacey engaging with B.M. during visits, as Lacey tended "to remain seated on the couch while [B.M. is] playing on the floor." She did not believe B.M. could be reunited with Lacey at the time of the hearing.

Similarly, the FSRP worker testified Lacey's motivation to improve had dissipated by February 2018, with her being less likely to hold or soothe B.M. since then. She believed Lacey had addressed—but not corrected—all of the safety concerns in the home. A May 2018 report from the same FSRP worker shows Lacey may be able to mimic proper parenting, but she lacks the skill to safely parent alone:

Lacey continues to show reservation and reluctance in physically and emotionally soothing and consoling [B.M.]. When consultant and [the grandmother] are present at the same time, [the grandmother] automatically takes over parenting [B.M.] by playing with him on the floor, automatically coming to his rescue when he is hurt or upset, [or] instructing Lacey to do it and how to do it.

Lacey's therapist provided a letter dated May 17, 2018. The therapist noted Lacey has complied with recommendations and attendance, except for a period in October and November 2017 due to a lapse in insurance. The therapist also provided the following opinion:

It is this therapist's continued concern that Lacey demonstrated little to no commitment to maintaining recovery long-term. She identified minimal positive supports in her life that will help her be successful in recovery. This therapist has continued to encourage Lacey to engage in activities that will allow her to sustain her recovery long-term such as attending NA meetings as well as participate in a substance abuse group . . . . Lacey has verbally agreed to participate in these activities, but without consistent follow through. Lacey appears to struggle with internalizing the need for change which will result in a struggle to be successful in maintaining long-term recovery. Sobriety is simply the absence of use. Recovery is about long-lasting life changes that go far beyond treatment, including building recovery supports and making connections to the recovery community. While Lacey has made progress in maintaining sobriety while in treatment, much of the motivation appears to be external. She has not voiced commitment to the permanent lifestyle choice and changes that support long-term recovery.

The therapist's observations are telling considering Lacey's long-term drug abuse, as described in the Social Report created just one year before the termination hearing:

Lacey first started using methamphetamine when she was eleven years old. She used meth once a month until she was fourteen, which was when she discovered marijuana. At this time, she stopped using meth and used marijuana instead. Then, at age seventeen, she started using marijuana and methamphetamine simultaneously. Lacey used these substances three or four times a day for about three years, until she found out she was pregnant.

I agree with the majority that economic factors alone cannot form the basis for termination of parental rights, but a parent's overall decision-making ability is a valid consideration. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014). To her credit, Lacey has found safe and reliable housing during a vulnerable period by living with her parents. However, she has not secured a job or disability payments. While she testified she buys "quite a bit of stuff for" B.M., the only source of income she identified was to "sell my own stuff." She has not had a driver's license since the end of 2017 due to a 2016 conviction for operating while intoxicated; her license has not been reinstated because she has not taken the required impaired driver's course.

Finally, her interactions with Robert, B.M.'s presumptive father who is currently in prison, are concerning. She testified he is not a positive influence, she is no longer in a relationship with him, and she has tried to distance herself from him for the past year. However, she also testified, "I have love for him." She continued speaking with him in prison throughout these proceedings, with their last phone call five or six weeks before the hearing, even though their relationship has been a concern since the beginning of DHS involvement. She would not comment on the contents of a January 2018 series of phone calls between the two of them, testifying only "I do not recall."

Lacey has undoubtedly made progress since the beginning of DHS involvement. However, despite a year of services, the record clearly and convincingly proves Lacey is still unable to safely parent B.M. alone. As the FSRP worker summarized in the May 2018 report:

Overall, Lacey's protective capacities are very minimal at this time due to the incapacity. Lacey needs to continue to address her mental health issues along with her substance abuse issues as these are two of the primary risks to [B.M.'s] wellbeing.

B.M. is at a tender age, and he need not wait any longer for his mother to become a responsible parent. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Children simply cannot wait for responsible parenting. Parenting . . . must be constant, responsible, and reliable."). Therefore, I would affirm the termination of parental rights, and I respectfully dissent.