# IN THE SUPREME COURT OF IOWA

No. 21–0314

Submitted September 15, 2021—Filed October 15, 2021

**IN THE INTEREST OF D.M.**, Minor Child,

**D.M.,** Father,

Appellee.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Warren County, Brendan Greiner, District Associate Judge.

A father seeks further review of a court of appeals decision reversing the juvenile court's permanency order that transferred sole custody of the child to the father. **DECISION OF COURT OF APPEALS AFFIRMED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Frank Steinbach III of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman, P.C., West Des Moines, for appellee father.

Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, for appellant mother.

Magdalena Reese of Juvenile Public Defender, Des Moines, attorney and guardian ad litem for appellant minor child.

**CHRISTENSEN, Chief Justice.**

This case requires us to determine whether the juvenile court was correct in issuing a permanency order transferring sole legal custody of an eight-year-old child to Dad when Mom has substantially complied with court-ordered services and the child could be returned to her care with a short transition. The State initiated a child-in-need-of-assistance (CINA) proceeding after the parents' inability to coparent led to numerous reports to the Iowa Department of Human Services (DHS). At the time, Mom was the primary custodial parent under a shared parenting schedule between the parents, but she struggled with mental health issues, housing instability, and ensuring the child made it to school. Additionally, both parents had difficulty coparenting. Mom participated in services to reunify with the child and showed great progress. At the permanency hearing, professionals in the case recommended a brief transition plan to reunify the child with Mom over the course of a four- to six-week transition. Nevertheless, the juvenile court determined it was not safe to return the child to Mom's home and entered a permanency order transferring sole legal custody of the child to Dad. Mom and the guardian ad litem (GAL) appealed, and the court of appeals reversed.

We granted Dad's further review application. On our de novo review, we conclude there was convincing evidence to show the child could safely be transitioned to Mom's care at the time of the permanency hearing. Therefore, we affirm the decision of the court of appeals and reverse the juvenile court's permanency order transferring sole legal custody of the child to Dad.

**I. Background Facts and Proceedings.**

Mom and Dad are the divorced parents of eight-year-old D.M. This case has been ongoing since the State initiated CINA proceedings in February 2019, following the completion of several child-protective assessments. Some of these assessments were founded or confirmed, but most were unfounded. One of the confirmed assessments named Dad as the perpetrator and one of the founded assessments named Mom as the perpetrator. The most recent incident occurred on December 26, 2018, and involved a physical altercation between the parents that resulted in Mom's arrest. At the time, the parents had a shared parenting schedule with Mom as the designated primary custodial parent,[1] but the parents struggled to appropriately coparent D.M.

The parents stipulated to the CINA adjudication, and the juvenile court placed D.M. in the temporary legal custody of Dad under DHS supervision with fully-supervised visitation for Mom. In its order, the juvenile court noted a myriad of concerns. These concerns involved Mom's inability to understand D.M.'s medication, use of corporal punishment, mental health issues, criminal history, and imminent eviction. There were also concerns about D.M.'s anxiety and fear of being in Mom's care. Moreover, there were concerns about both parents' ability to coparent and how their poor coparenting skills were negatively impacting D.M.

---

[1]The juvenile court and the court of appeals incorrectly stated the parents had shared physical care of D.M. The district court entered an order on June 19, 2018, indicating Mom is the designated primary custodial parent with a shared parenting schedule and denying Dad's request seeking a temporary change of custody based on an alleged substantial change in circumstances.

Although Mom had some setbacks, she gradually participated in services to improve her mental health issues and parenting skills. Progress was evident to the juvenile court at a June permanency hearing when the court granted her an additional six months to work toward reunification. The court reasoned the need for removal would no longer exist in six months so long as Mom could "demonstrate the ability to provide a safe and stable home environment for [D.M.] to live" and "effective co-parenting with [Dad]." The court subsequently scheduled a permanency hearing for January 2021. Before that hearing, Mom filed a motion to modify disposition and placement claiming Dad was undermining her reunification efforts by discouraging D.M.'s relationship with Mom. Mom also maintained she had engaged in the recommended services and no safety concerns remained. The juvenile court modified the dispositional order to grant Mom visitation with D.M. at the discretion of the GAL in consultation with DHS and declared it would consider the remainder of the motion at the permanency review.

The permanency hearing took place over two days in January and February 2021. By this point, Mom's visits with D.M. had increased to incorporate overnight visits, Mom had demonstrated progress with her therapist in regulating her emotions and learning to coparent, and both parents had started to participate in family therapy with D.M. At the hearing, DHS recommended a short period of additional time for Mom and D.M. to work toward reunification because they had only started family therapy in October. Mom sought immediate return of D.M. under the parents' custody arrangement that

designated her as the primary custodial parent or, alternatively, more time to transition D.M. back to her care over the course of a few weeks. The GAL recommended the implementation of a brief plan to transition D.M. back to the parents' custody arrangement of shared parenting with Mom as the designated primary custodial parent. Dad asked the juvenile court to enter a permanency order leaving D.M. with him and to grant concurrent jurisdiction for him to obtain a custodial order in district court in conformance with the juvenile court order.

At the hearing, the GAL reported D.M. initially expressed fear of residing with Mom but that fear minimized over time. Similarly, D.M.'s therapist testified that D.M. had some resistance to Mom but that D.M. was "unable to give any responses" explaining her resistance "outside of, I don't feel safe, or [s]he hurts my feelings" when asked why she did not want to live with Mom. The therapist noted that Mom "has worked very hard to follow through on the recommendations by [the] Court" and that Mom "has built skills surrounding taking accountability for the things that she has done that has maybe strained the relationship with [D.M.] or even others in the family system." She also "believe[d] that [Mom] has done the work in individual therapy to work on building that connection with [D.M.] again" and testified that reunification with Mom was in D.M.'s best interest. While D.M. had also told a clinical social worker that she did not feel safe in Mom's care, the clinical social worker testified that D.M.'s actions demonstrated the contrary. The clinical social worker and D.M.'s

therapist both expressed concerns that Dad and his wife were coaching D.M. to make these statements.

The DHS case manager explained that although Mom was asking for reunification, DHS was asking for a gradual transition back to her to help D.M. with the adjustment because an immediate return "would be overwhelming for [D.M.] . . . and that anxiety would make that very challenging for her." She noted the professionals involved in the case were all of the opinion that the barriers initially causing Mom's instability no longer existed and described a transition plan that would involve increasing the frequency of D.M.'s overnight visits with Mom over the course of four to six weeks until D.M. was back in the parents' shared parenting schedule under the custody agreement.

By the second day of the hearing in February, the transition plan had already been initiated, and D.M. was attending overnight visits with Mom twice per week, which would increase to three overnight visits the following week. On the second day, the court appointed special advocate (CASA) and the family centered services (FCS) worker both testified that they did not have any concerns about returning D.M. to Mom's care. Two of D.M.'s teachers testified about concerns they had based on their interactions with Mom during D.M.'s virtual schooling, with one explaining Mom "appeared" and "sounded angry" during the one time they met in December 2020 and another teacher expressing concern that Mom did not have the necessary materials to facilitate D.M.'s virtual learning. The DHS case manager testified that she did not have the same concerns as the educators. Finally, Mom's two estranged sisters testified on

Dad's behalf over Mom's objection about their concerns with Mom, but they both acknowledged they had not had contact with Mom for years and had only minimal contact with D.M. through Dad.

The juvenile court issued its permanency order a few weeks after the permanency hearing, concluding it was in D.M.'s best interest to be placed in the sole custody of Dad with some visitation for Mom. The juvenile court noted D.M.'s and Mom's progress in therapy as well as Mom's progress on other fronts, including her progression to unsupervised visitation, which went well for D.M. and which D.M. enjoyed. Yet, the juvenile court concluded that returning D.M. to her parents' shared care "would have harmful effects on [the child's] mental and emotional health." It highlighted Mom's alleged negative interactions with the two teachers who testified and indicators from D.M. of trauma while at school and asserted its belief that Mom was manipulating the professionals in her case to believe reunification was imminent based on her progress. Further, the juvenile court reasoned the coparenting issues still remained and would continue in the future.

Mom and the GAL appealed. The State did not appeal, but it filed a statement on appeal with our court asserting it "fully agreed with the GAL and recommended return of the child to the mother's home" and "d[id] not inten[d] to file a response defending the juvenile court order with which it disagreed." The court of appeals reversed the juvenile court's permanency order and remanded the matter back to the juvenile court to enter a permanency order either returning D.M. to Mom's care pursuant to the parents' shared parenting

schedule or providing Mom additional time to reunify with D.M. Dad filed an application for further review, which we granted.

## II. Standard of Review.

We review CINA proceedings de novo. *In re D.D.*, 955 N.W.2d 186, 192 (Iowa 2021). In doing so, we give the juvenile court's factual findings weight, but we are not bound by them. *Id.* Our "paramount consideration" is protecting the child's best interests. *Id.*

## III. Analysis.

Mom and the GAL contend that the juvenile court erred in concluding D.M. could not be returned to Mom's care and in transferring custody from Mom to give Dad sole legal custody.[2] Under Iowa Code section 232.104(2) (2020), the juvenile court must exercise one of the following options after a permanency hearing: (a) enter an order returning the child to the child's home (meaning the parents' shared care with Mom as the primary custodial parent in this case); (b) continue the child's placement for an additional six months based on an enumeration of "the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period;" (c) direct the State to initiate termination proceedings; or (d)

---

[2]Mom also argues that the juvenile court erred in overruling her objections at the permanency hearing to allowing her two sisters to testify. The court of appeals concluded that Mom waived this argument by failing to cite any relevant legal authority to support her argument. "We have discretion to choose which issues we review when we take a case on further review" and choose to let the court of appeals decision stand on this issue. *Holmes v. Pomeroy*, 959 N.W.2d 387, 389 (Iowa 2021).

transfer sole custody of the child from one parent to another. Iowa Code § 232.104(2)(*a*)–(*d*). Although the juvenile court has the authority to transfer custody to the noncustodial parent, "[a]ny such placement is subject to the constraints in section 232.102, including the goal of returning the child to the original custodian as quickly as possible." *In re Blackledge*, 304 N.W.2d 209, 214 (Iowa 1981) (reversing the juvenile court's transfer of custody of the children from Mom to Dad while the children were adjudicated CINA due to Mom's parenting struggles and criticizing the juvenile court for letting a comparison of the parents' homes influence its decision). Here, the juvenile court chose to transfer sole custody of D.M. to Dad. To do so, the juvenile court needed "convincing evidence" that termination of D.M.'s relationship with Mom was not in D.M.'s best interest, the family was offered services to correct the situation that led to D.M.'s removal from Mom's home, and D.M. could not be returned to Mom's home. Iowa Code § 232.104(4). "When the evidence shows the [child's] return will not produce harm, the child is to be reunited with the [custodial] parent." *In re Blackledge*, 304 N.W.2d at 214.

When the juvenile court granted Mom an additional six months to work toward reunification in June 2020, it directed Mom to show that she could "provide a safe and stable home environment for [D.M.] to live" and "demonstrate effective co-parenting with [Dad.]." Mom made the most of those additional six months, as she alleviated the concerns about being able to provide a safe and stable home environment for D.M. and made significant progress toward her goal of reunifying with D.M. By the second day of the permanency hearing, D.M. was

already attending overnight visits with Mom twice per week, and those visits were set to increase to three nights per week beginning the following week.

The record overwhelmingly supports the conclusion that D.M. could be returned to Mom's care, preferably through a gradual transition lasting about a month to six weeks to assuage D.M.'s anxiety surrounding this change. The only reason the professionals advocated for a gradual transition rather than immediate reunification was for D.M.'s benefit, not because Mom lacked the parenting skills to reunify with D.M. As D.M.'s therapist explained, D.M. needed time to adjust to her "new normal" because she has struggled with "the unknown of the future and what's going to happen and changes that happen of different movings and transitions." Yet, the therapist had no concerns about reunifying D.M. with Mom and asserted reunification was in D.M.'s best interest.

While two of D.M.'s teachers expressed concerns about Mom and testified that D.M. told them she did not like visiting Mom, this testimony carries little weight because it concerned only isolated incidents based largely on the teachers' limited interactions with Mom through virtual schooling and D.M. almost always completed virtual schooling in Dad's home with Dad or Stepmom in the vicinity. Likewise, the negative testimony about Mom from her sisters is of little to no value because the sisters have not had contact with Mom in years and were not around to witness Mom's progress or interactions with D.M. Similarly, Dad's past investigations by DHS[3] are given little to no value because they

---

[3]These investigations include a confirmed report for denial of critical care in 2013 naming him as the perpetrator for pushing Mom to the ground and causing her to almost land on then

occurred years before. In contrast, the GAL, clinical social worker, FCS worker, DHS case manager, D.M.'s therapist, Mom's therapist, and CASA—all professionals who have had far greater and more recent interactions with Mom and D.M. throughout this case—supported reunifying D.M. with Mom. *See, e.g.*, *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (explaining we give weight to the testimony and recommendations of professionals like the DHS case manager and GAL who personally observe interactions between the parent and child).

Some coparenting issues still remained at the time of the permanency hearing, but it's not for a lack of progress by Mom. The word "coparenting" implies that an effort will be made by more than just one parent. At the permanency hearing, the State, the GAL, and various professionals raised concerns about Dad's negative impact on D.M. in terms of hindering a relationship between D.M. and Mom. As the State declared in closing, "The Department [of Human Services] has no safety concerns with Mother in her residence, nor has FCS. I think the concerns are the comments that are made and things that are said by Dad and Dad's wife that has caused this case to go longer." Both D.M.'s therapist and clinical social worker expressed concerns that Dad and his wife were directly or indirectly coaching D.M. to undermine Mom's reunification efforts through comments about Mom and actions surrounding D.M.'s visits with Mom, such as making D.M. wash her clothes and toys upon returning from Mom's house and claiming they smelled or were dirty. The

seven-month-old D.M. and a family assessment in 2014 after D.M. received burn marks around her neck from getting tangled in a dog leash while she was in Dad's care.

therapist and clinical social worker both testified that D.M.'s *behavior* demonstrates her desire to be with Mom and comfort around Mom, while her *words* contradicted these actions at times.

The GAL astutely observed,

> This family needs to work together, but it cannot say it all falls on [Mom] to say that she has a deficiency as it relates to the co-parenting issue. I think most of all that came to me—that became apparent to me by Father calling the mother's estranged relatives to testify that [D.M.] is currently having contact with those relatives. If nothing else, that certainly shoots up red flags for me as a Guardian ad Litem as it relates to this family's ability to co-parent.

This behavior on Dad's part is especially concerning given Dad was on probation at the time of the permanency hearing for threatening and harassing behavior directed at an ex-girlfriend.

Mom should not be penalized for Dad's lack of effort and progress in coparenting. *Cf. In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020) ("[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." (quoting *In re D.G.*, 704 N.W.2d 454, 459 (Iowa Ct. App. 2005))). Notably, both parents were ordered to complete intensive coparenting instruction, but only Mom completed it. The FCS worker took responsibility for Dad's failure to complete the class, but it was clear from the worker's testimony that Dad actually was responsible for failing to complete it. The worker explained that he had given Dad the coparenting materials and met with Dad and his wife "a couple of times" but that "[b]oth times[,] they hadn't had the opportunity to review [it]," so the worker essentially did not continue to raise the issue with him. Dad's failure to complete the material was due to his

own failure to prioritize it. The FCS worker made it available to Dad with instructions on how it should be completed. He chose to take a shortcut from the FCS worker's instruction plan for the court-ordered coparenting class by choosing not to read the material as instructed and relying instead on the FCS worker's attempted summary. Overall, Mom demonstrated a greater willingness to work on the coparenting issue than Dad and, in turn, demonstrated substantial progress on this front.

Yet, one would not know this from reading the juvenile court's permanency order. In finding D.M. could not safely be returned to Mom, the juvenile court notes the "most convincing evidence" is the testimony of two of D.M.'s teachers based on isolated incidents that occurred during virtual schooling, some of which occurred at Dad's home. The juvenile court offers no other support in its analysis as to why D.M. cannot be returned to Mom. As we have already noted, the teachers' testimony has little relevance and is contrary to the observations and recommendations for D.M.'s return to Mom from the many professionals who have long been involved in this case.

The juvenile court's permanency order also substantially disregards Dad's role in how this case came to the DHS's attention. As the CPS assessment that led to this case documented,

> There have been 15 allegations reported into DHS regarding [D.M.'s] care in *these parents*['] *homes*. DHS has completed 7 assessments with an additional assessment open at this time. . . . [D.M.] has been participating in counseling, however this is not consistent as *the parents* have disagreed on counselors for her to where this has changed providers hindering [D.M.'s] ability to connect and develop a relationship with a counselor. The D[HS] has previously not been able to intervene with *this family* as there has not been an incident

> that has risen to the level of child abuse. . . . [*The parents*] need to be able to co-parent this child. *They* need to be able to have healthy communication regarding their child and leave her out of their personal conflicts. *The parents* need to participate with services to address these concerns.

(Emphasis added.) While it is true that the CINA petition resulted from a CPS assessment in which Mom was at fault and Mom was the less stable parent of the two at the time, Dad's actions also contributed to the turbulent family dynamics that D.M. was forced to endure for several years. By no means was Dad an innocent bystander throughout all of this.

Ultimately, Mom took the steps required of her to reunify with D.M. and it is compelling that none of the professionals who have worked with Mom and D.M. throughout this case have concerns about returning D.M. to the custodial arrangement in place at the time of removal. It is clear from the record that D.M. could safely be returned to Mom's home at the time of the permanency hearing under the parents' shared parenting schedule with Mom as the primary custodial parent. *See In re Blackledge*, 304 N.W.2d at 214 ("When a child is removed from the home, services are provided to the parent to facilitate the child's return. When the evidence shows the return will not produce harm, the child is to be reunited with the parent."). Nevertheless, DHS's involvement with the family did not end at the permanency hearing and we do not have a record of whether transition-aimed visitation has continued or what has transpired since the February 2021 permanency order. Consequently, we reverse the juvenile court's permanency determination and remand the matter to the juvenile court to enter a permanency order either returning D.M. to Mom's physical care pursuant to

the parents' shared parenting schedule or granting Mom additional time for gradual reunification based on our determination that further transition planning would terminate the need for removal within six months.

We close with a reminder for juvenile courts. The primary goal of the juvenile court in CINA proceedings is reunification when parties have specifically complied with court-ordered services, not establishing or modifying custody. "The parent's right to have a child returned . . . is not measured by comparing the parent's home to the [other parent's] or an ideal home. Rather the parent's right is established by negating the risk of recurrence of harm." *Id.* at 214–15 (holding the juvenile court erred in comparing the mother's home to the father's home in determining the best interests of the children required transferring legal custody and placement to the father). "[T]he spirit of assistance proceedings is to improve parenting skills and maintain the parent–child relationship." *In re M.S.*, 889 N.W.2d 675, 686 (Iowa Ct. App. 2016) (en banc).

When the juvenile court granted Mom an additional six months, it stated the need for removal would no longer exist in six months if Mom could "demonstrate the ability to provide a safe and stable home environment for [D.M.] to live" and "demonstrate effective co-parenting with [Dad]." Mom took those words to heart by taking the steps she needed to alleviate these issues and cannot be held solely responsible for any lingering coparenting issues that stem from Dad's role in the parenting relationship. "[Mom] is not perfect, but the law does not require perfection." *Id.* When Mom met the juvenile court's directives, it should have taken the steps necessary to return the family to its original custody

agreement with Mom as the primary custodial parent and left the parents' custody issues for district court. To do otherwise was an unauthorized modification of the custody agreement by the juvenile court. Therefore, we reverse the judgment of the juvenile court.

**IV. Conclusion.**

For these reasons, we affirm the decision of the court of appeals, reverse the judgment of the juvenile court, and remand this matter for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED.**